UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Darrell Kimball</u>

      v.                                Civil No. 21-cv-943-LM
                                         Opinion No. 2022 DNH 084 P

<u>Kilolo Kijakazi, Acting Commissioner</u>
<u>Social Security Administration</u>

**O R D E R**

Darrell Kimball seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the decision of the Acting Commissioner of the Social Security Administration that denied his applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act.  In support, Kimball contends that the decision that he is not disabled should be reversed because the Administrative Law Judge ("ALJ") erred in four ways: (1) by omitting knee pain as a severe impairment at Step Two; (2) in her evaluation of Kimball's testimony in light of other evidence in the record; (3) in her consideration of the medical opinion evidence; and (4) in the residual functional capacity assessment.  The Acting Commissioner moves to affirm, and Kimball moves to reverse.  The court grants the Acting Commissioner's motion to affirm and denies Kimball's motion to reverse.

**STANDARD OF REVIEW**

For purposes of review under § 405(g), the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999);

accord Sacilowski v. Saul, 959 F.3d 431, 437 (1st Cir. 2020).  The court defers to the

ALJ's factual findings if they are supported by substantial evidence.  Biestek v.

Berryhill, 139 S. Ct. 1148, 1153 (2019).  Substantial evidence is "more than a mere

scintilla" and means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  Id. at 1154.  "Substantial evidence review is

more deferential than it might sound to the lay ear: though certainly more than a

scintilla of evidence is required to meet the benchmark, a preponderance of evidence

is not."  Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).  Therefore, the court must

affirm the ALJ's findings, even if the record could support a different conclusion,

when "a reasonable mind, reviewing the evidence in the record as a whole, could

accept it as adequate to support [the ALJ's] conclusion."  Irlanda Ortiz v. Sec'y of

Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991); accord Purdy, 887 F.3d

at 13.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability for purposes of the Social Security Act, a claimant

must demonstrate an "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be

expected  .  .  .  to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).  The Social Security Administration has

established a five-step sequential process for determining whether a claimant has

made the requisite demonstration.  20 C.F.R. § 404.1520(a)(4); 20 C.F.R.

§ 416.920(a)(4)[1]; see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  The five-step process poses "questions that are sequential and iterative, such that the answer at each step determines whether progression to the next is warranted."  Sacilowski, 959 F.3d at 433.

The steps are as follows: (Step 1) whether the claimant is currently engaging in substantial gainful activity; if not, (Step 2) whether the claimant has a severe impairment; if so, (Step 3) whether the impairment meets or medically equals an entry in the Listing of Impairments; if not, (Step 4) whether the claimant's residual functional capacity is sufficient to allow him to perform any of her past relevant work; and if not, (Step 5) whether, in light of the claimant's residual functional capacity, age, education, and work experience, he can make an adjustment to other work available in the national economy.  Id. (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v)).  The claimant bears the burden of showing he is disabled through the first four steps, but at Step 5 the Commissioner must provide evidence to show that there are jobs in the national economy that the claimant can do.  Sacilowski, 959 F.3d at 434.

## BACKGROUND

Kimball was laid off from his job as a facilities worker at Sodexo (a food services and facilities management company) on June 1, 2015, because the Sodexo

---

[1] Unless otherwise noted, the court will cite the regulations under Title II, 20 C.F.R. pt. 404, which are not materially different from the Title XVI regulations, 20 C.F.R.  pt. 416, in the context of this case.  See Sullivan v. Zebley, 493 U.S. 521, 525 n.3 (1990); Monteiro v. Saul, No. 20-cv-12189-RWZ, 2022 WL 867988, at *1 n.1 (D. Mass. Mar. 23, 2002).  The analysis, however, applies equally to the application under Title XVI.  Monteiro, 2022 WL 867988, at *1 n.1.

facility was closing.  He has not returned to full-time work since.  He states that he has held part-time jobs since then with UPS, in food preparation, and at Lowe's. Kimball lives with his parents and his adult brother.  He has a history of mental health issues.

I.   <u>Health History</u>

Kimball was treated for depression by Dr. Richard Pohl, a psychiatrist, from 1999 until September 2016, when Dr. Pohl retired.  In July 2016, Kimball was admitted to the hospital because of delusional thoughts about his father kidnapping the family.  Staff determined that the issue was caused by Kimball's misuse of Ativan in combination with a lack of sleep and high anxiety.  He was discharged on August 5, 2016, with medications and instructions to follow up with his primary care physician.

After Dr. Pohl's retirement, Kimball was arrested for threatening his family. His father tried to have him involuntarily committed for emergency psychiatric care, but that treatment was denied because Kimball was in jail.  Kimball received treatment with Christopher O'Shea at Wilmington Family Counseling until June 2018.  Kimball then received medication management services at Smallwood Clinic in Nashua.  When the clinic closed, Kimball received treatment at the Center for Life Management.

Kimball developed pain in his right knee in August 2019 after a fall in April of that year.  By October 2019, his knee pain had improved significantly, despite his

failure to go to physical therapy.  On examination, Kimball had a full range of motion in his knee, normal strength, and normal sensation.  Treatment notes indicate that despite anxiety and a practitioner's concern related to Kimball having two separate prescriptions for Ativan, he was not in emotional distress and showed no signs of functional impairment.

II.    Evaluations

In connection with his application for benefits, Kimball was examined by Philip Robbins, Ph.D., for a consultative evaluation in April 2017.  Kimball reported that he was working part time.  His daily activities included going to his parents' home to help them, cleaning, doing laundry, driving, shopping, paying bills, and taking his mother to appointments.  Based on his examination, Dr. Robbins found that Kimball could function and interact appropriately in a work setting and could manage his anxiety and depression.  Dr. Robbins's prognosis was guarded because of Kimball's history and because treatment had not lessened his symptoms.  State agency psychologist Edward Martin, Ph.D., reviewed Kimball's records, including Dr. Robbins's report, and concluded that Kimball had only mild functional limitations.

Consultative examiner Darlene Gustavson examined Kimball in August 2018.  Dr. Gustavson administered several tests and determined that Kimball was capable of functioning in a work setting.  John Pelletier, Sc.D., reviewed Kimball's

records, including the reports submitted by Drs. Robbins and Gustavson, and found no evidence as of September 2018 of significant functional limitations.

In April 2019, Dr. Christopher Smallwood, who treated Kimball from June 2018 until April 2019, completed a Mental Impairment Questionnaire for Kimball. On the form, Dr. Smallwood checked boxes to show that Kimball was "moderately" and "markedly" limited in all areas of mental functioning. The form indicates that Kimball had serious and persistent impairments over the past two years with only marginal adjustment.

Andrew Carlsen, MS, conducted a mental health intake evaluation at the Center for Life Management in May 2020. Carlsen noted that Kimball was alert and oriented with proper memory and recall and that he reported healthy daily activities but appeared disheveled with poor hygiene. Carlson diagnosed Kimball with generalized anxiety disorder and post-traumatic stress disorder and concluded that Kimball would benefit from case management at the Center for Life Management, individual therapy, medication monitoring, and supportive employment.

III.   Procedural Background

The first hearing on Kimball's applications for benefits was held on May 10, 2019. Kimball was represented by counsel and testified at the hearing. His father, Randall H. Kimball, also testified. A vocational expert provided testimony about jobs available. The ALJ issued a decision on July 31, 2019, finding that Kimball

was not disabled.  The Appeals Council sent the case back to the ALJ to address seven specified matters from the original decision.

A second hearing was held on October 22, 2020.  Kimball, represented by counsel, testified.  A vocational expert also testified.  The ALJ issued her second decision on January 4, 2021.  She found that Kimball had severe impairments because he had a depressive disorder and an anxiety disorder.  Despite those impairments, the ALJ found that Kimball had the residual functional capacity to do work at the medium exertional level with certain limitations, was able to understand and remember simple instructions, and was able to attend and focus enough to complete simple tasks.  She found that, while he could interact appropriately with co-workers, he should have only brief and superficial contact with the public.

Based on that residual functional capacity and the vocational expert's testimony, the ALJ found the Kimball was unable to return to any of his former work.  However, the ALJ further found that Kimball could work as a cart attendant, lab equipment cleaner, and hand packager.  As a result, the ALJ found that Kimball was not disabled.  The Appeals Council denied review on September 15, 2021, making the ALJ's second decision the final decision of the Acting Commissioner.

## DISCUSSION

Kimball moves to reverse the Acting Commissioner's decision on the grounds that the ALJ erred in the following four ways: (1) at Step 2 by not finding that his

knee pain was a severe impairment; (2) in accepting Kimball's testimony and rejecting his father's testimony and evidence of his lack of earnings; (3) in relying on the opinions of consultative physicians; and (4) in her residual functional capacity assessment of Kimball's physical capacity. The Acting Commissioner moves to affirm, asserting that the ALJ properly assessed and construed the testimony and evidence, properly assessed severe impairments at Step 2, and properly assessed Kimball's residual functional capacity. The court addresses each of Kimball's arguments below.

I.      Step 2 Findings

At Step 2, the ALJ reviews the record to determine whether the claimant has a severe medically determinable impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is medically determinable if it "result[s] from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." Id. § 404.1521. "Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source" but cannot be based on the claimant's "statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment." Id. An impairment is severe, at Step 2, if it significantly limits the claimant's ability to work. § 404.1520(c). Any error at Step 2 is harmless if at least one severe medically determinable impairment is found, and the ALJ continues along the sequential analysis. Syms v. Astrue, No. 10-cv-499-JD, 2011 WL

4017870, at *1 (D.N.H. Sept. 8, 2011); accord Tammy B. v. Kijakazi, No. 21-22MSM, 2022 WL 909400, at *2 (D.R.I. Mar. 29, 2022).

The ALJ found that Kimball had severe medically determinable impairments of a depressive disorder and an anxiety disorder.  She also considered Kimball's right knee condition in analyzing whether he had a severe impairment.  The ALJ noted that Kimball alleged a bad right knee but that his treatment records showed that he had never been diagnosed with a specific medically determinable knee condition and that more recent treatment notes show a full range of motion in his knee and normal strength.  The ALJ stated, however, that she was construing the record in Kimball's favor, and while not finding a severe impairment because of his knee, she did restrict his residual functional capacity based on his reports of pain.  Therefore, Kimball has not shown any error, and even if error occurred, it would have been harmless.

II.     Non-Medical Source Opinion

Next, Kimball argues that the ALJ erred in relying on Kimball's statements to medical care providers about his ability to function and his work activity as opposed to relying on Kimball's testimony at both hearings, his father's third-party function reports, or his father's testimony at the first hearing that Kimball was significantly limited in his ability to function and had not worked since May 2015.[2]

---

[2] Kimball told medical care providers that he had held several part-time jobs. As the ALJ noted, Kimball's descriptions of those jobs were quite specific and detailed, and Kimball and his father both had referred to Kimball's work doing online

Kimball further argues that his earnings records show that he did not have part-time work during that period. He contends that the ALJ did not follow the direction from the Appeals Council to explain the weight given to the non-medical opinion evidence and, specifically, his father's reports and testimony.

20 C.F.R. § 404.1527(f) directs the consideration that is given to opinions from nonmedical sources, including the claimant's family members. See Kolberg v. Kijakazi, No. 20CV560, 2021 WL 3861339, at *4 (M.D.N.C. Aug. 30, 2021); Kelsey P. v. Comm'r of Soc. Sec., No. 19-CV-317 (JLS), 2020 WL 6937986, at *4 (W.D.N.Y. Nov. 24, 2020). In weighing that evidence, an ALJ should consider the nature of the source's relationship with the claimant, the degree of consistency with other evidence in the record and with the claimant's own statements, and any other relevant factors. Dougherty v. Saul, No. 20-CV-504, 2021 WL 3077504, at *6 (M.D. Pa. July 21, 2021); Marquez v. Saul, No. 20-CV-110-KRS, 2021 WL 2073510, at *9 (D.N.M May 24, 2021); Kelsey, 2020 WL 6937986, at *4; Larue v. Saul, No. 20-cv-391-PAB, 2021 WL 1207448, at *9 (D. Colo. Mar. 31, 2021). An ALJ can credit the claimant's testimony about his functional and work capacity even if it conflicts with his parent's opinion, may consider the parental relationship in assessing that opinion, and may give less weight to conflicting opinions. Kelsey, 2020 WL 6937986, at *4.

---

surveys. Kimball's father, however, testified and made reports that Kimball had not held any part-time jobs and had not worked since 2015. Kimball also testified at the hearings that he had not worked. The ALJ reported that the earnings statements in the record did not show any earnings since 2015.

The ALJ addressed Kimball's father's testimony and reports.  She noted the family relationship and described the father's opinions and testimony in detail.  She stated that she gave little weight to Kimball's father's reports and prior hearing testimony about the severity of Kimball's mental health symptoms because the record showed that the issues the father described were addressed when Kimball took his prescribed medications.  She stated that the medication side-effects the father described were not included in the medical providers treatment notes.  The ALJ also explained that Kimball had the same mental health issues long before his alleged onset date, and he was able to work despite those issues.  She also recited Kimball's own reports about his activities to his medical providers that corroborated his other statements.

The ALJ adequately addressed the third-party reports and testimony provided by Kimball's father and properly explained why she gave his opinions little weight.  To the extent Kimball focuses on the conflicting evidence about whether he did part-time work after 2015, he has not shown that the ALJ relied on that evidence to support her residual functional capacity assessment or her finding that he was not disabled.[3]  Therefore, Kimball has not shown that the ALJ erred in her assessment of his father's opinions.

---

[3] Instead, the ALJ reviewed those records in detail at Step 1 for the purpose of determining that Kimball was not engaged in substantial gainful activity.  When Kimball's reports to medical providers about his part-time work are mentioned, the ALJ states that she has included that information "for the record."  Admin. Rec. 29.

III.    <u>Medical Opinion Evidence</u>

Third, Kimball argues that the ALJ erred in her consideration of the medical opinion evidence.  All medical opinions are considered as part of the disability determination, 20 C.F.R. § 404.1527(c)[4], but they are given different weight under this regulation depending on the following factors:

> (1) Examining relationship.  Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.
>
> (2) Treatment relationship.  Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's medical opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.
>
>> (i) Length of the treatment relationship and the frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source.

---

[4] Because Kimball filed his application for benefits in January of 2017, the version of the regulation before amendment in March of 2017 applies here.

(ii) Nature and extent of the treatment relationship.  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her medical opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's medical opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability.  The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions.  We will evaluate the degree to which these medical opinions consider all of the pertinent evidence in your claim, including medical opinions of treating and other examining sources.

(4) Consistency.  Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.

(5) Specialization.  We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.

(6) Other factors.  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the medical opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that a medical source has, regardless of the source of that understanding, and the extent to which a medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

13

Under § 404.1527(c), prior to amendment, generally a treating physician's opinion was entitled to more weight than the opinions of consultants or non-examining sources, and the ALJ was required to give good reasons for the weight given to a treating source's opinion if the ALJ did not give it controlling weight.  See, e.g., Ramos v. Kijakazi, --- F. Supp. 3d ---, 2022 WL 993754, at *3 (D. Mass. Mar. 31, 2022).  Kimball contends that the ALJ erred in the weight given to the opinions of Drs. Pohl and Smallwood and the state agency consultants.


    A.    <u>Drs. Pohl and Smallwood</u>

Kimball contends that the ALJ did not properly consider opinions provided by Dr. Pohl, his treating psychiatrist until September 2016, and Dr. Smallwood, his treating psychologist from 2018 to 2019.  In support, Kimball cites Dr. Pohl's treatment notes in 2015 and 2016, but he does not cite a functional capacity opinion provided by Dr. Pohl.  In his April 2019 opinion, Dr. Smallwood indicated that Kimball would have marked limitations in concentration and adaptation and would miss more than four days of work per month.

The ALJ provided good reasons for the weight she gave the opinions of Drs. Pohl and Smallwood.  The ALJ noted that Dr. Pohl had treated Kimball for mental health issues for many years while Kimball was able to maintain full-time employment.  The ALJ reported that Dr. Pohl wrote in his treatment records that Kimball's family took away his medications, which caused changes in Kimball's behavior, and that Dr. Pohl issued new prescriptions.  The ALJ also noted that Dr.

Pohl had written that Kimball experienced an exacerbation of his mental health issues in anticipation of Dr. Pohl's retirement and a resulting change in treatment. Kimball improved significantly, however, when his medications were restarted, and he began treatment with a new provider.  Moreover, the pages of Dr. Pohl's handwritten notes that Kimball cites do not include opinions about Kimball's functional capacity.[5]  Therefore, Kimball has not shown that the ALJ failed to properly consider any opinion provided by Dr. Pohl.

The ALJ acknowledged that Dr. Smallwood had a treating relationship with Kimball, although he had treated Kimball on only three occasions.  Because of the brevity of the relationship, however, the ALJ concluded that Dr. Smallwood lacked a treating relationship that would give him actual knowledge about Kimball's conditions.  The ALJ also noted that Dr. Smallwood's opinion was "drastically different" from the opinions of other providers and was inconsistent with Kimball's medical record, which she discussed in detail.  Therefore, the ALJ gave good reasons for affording little weight to Dr. Smallwood's opinion.

B.    Consultants' Opinions

Kimball also contends that the ALJ erred in relying on the opinions of four consultants who provided opinions about Kimball's mental functioning.  Two consultants based their opinions on their examinations of Kimball, and two gave

---

[5] The cited medical record from Melrose-Wakefield Hospital also does not provide a functional capacity opinion.

opinions based on a review of the record. Kimball contends that the ALJ erred in relying on the consultants' opinions because the consultants did not have the following pieces of evidence: Kimball's father's third-party function reports and testimony, Dr. Smallwood's opinion, and evidence of Kimball's knee pain. Kimball argues that the missing evidence would support greater limitations than the ALJ found and required the ALJ to provide an explanation.

A reviewing consultant's opinion does not provide substantial evidence to support an ALJ's residual functional capacity finding if the opinion was based on a significantly incomplete record. Giandomenico v. U.S. Soc. Sec. Admin., No. 16-cv-506-PB, 2017 WL 5484657, at *4 (D.N.H. Nov. 15. 2017) (citing Alcantara v. Astrue, 257 F. App'x 333, 334 (1st Cir. 2007)). The record reviewed by a consultant is significantly incomplete if "evidence added after the consultant's review materially changed the basis for assessing the claimant's limitations." Reed v. Saul, No. 19-12369-FDS, 2020 WL 4938341, at *6 (D. Mass. Aug. 21, 2020) (quoting Blakley v. Saul, No. 18-cv-702, 2019 WL 4668020, at *5 (D.N.H. Sept. 25, 2019)). When the record reviewed by a consultant is significantly incomplete, the ALJ must explain whether missing evidence was material to assessing the claimant's limitations. Laberge v. Berryhill, No. 18-cv-257-JL, 2018 WL 6819328, at *8 (D.N.H. Dec. 28, 2018).

In this case, the ALJ found highly persuasive Dr. Pelletier's September 2018 consultative review of the record, in which he concluded that the record contained no recent evidence that Kimball was experiencing serious mental health symptoms

that caused significant functional limitations. The ALJ noted that Dr. Pelletier did not review Dr. Smallwood's opinion, as Dr. Pelletier's opinion was prepared before Dr. Smallwood's. But the ALJ explained that Dr. Smallwood's opinion was not entitled to weight because it was inconsistent with his treatment notes, observations, diagnoses, and prescribed medications. The ALJ also summarized more recent treatment records that showed Kimball was doing well and had not exhibited any behaviors that required hospitalization since 2016. The ALJ credited Dr. Pohl's theory that Kimball's behavior in 2016 was caused by Kimball's anxiety due to Dr. Pohl's retirement.

The ALJ also gave weight to the opinion of examining consultant Dr. Robbins and the reviewing opinion of consultant Dr. Martin, who both found that Kimball's mental impairments did not render him disabled and that he was able to function adequately. The ALJ explained the weight given to those opinions in detail. The ALJ also gave weight to the functional assessment of Kimball by Dr. Gustavson, who found, based on her examination, that Kimball could function in a work setting.

In sum, the ALJ relied on opinions of examining consultants to support the residual functional capacity assessment. To the extent the ALJ relied on the opinions of reviewing consultants, she properly addressed the later opinion Dr. Smallwood provided. As Kimball acknowledges, his father's third-party reports were available to some of the reviewing consultants. Further, the ALJ explained why those reports did not provide evidence of materially different limitations.

Kimball has not, therefore, shown reversible error in the ALJ's consideration of the consultants' opinions.

IV.   Residual Functional Capacity

Finally, Kimball argues that the ALJ erred in the residual functional capacity assessment. A claimant's residual functional capacity is "the most [a claimant] can still do despite [his] limitations." § 404.1545(a)(1). That determination is made based on all the evidence in the administrative record. Id. In making a residual functional capacity assessment, an ALJ need not have a medical opinion that specifically provides that assessment but instead may rely on the relevant medical facts as a whole in assessing residual functional capacity. Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987). In doing so, however, the ALJ, as a lay person, may not interpret functional capacity from raw medical data or substitute her opinion for that of a physician. Nguyen, 172 F.3d at 35. Nevertheless, an ALJ may make common-sense assessments that are within the bounds of a lay person's understanding. Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990).

The ALJ found that Kimball had the residual functional capacity to do medium work, lifting 50 pounds occasionally and 25 pounds frequently, without other physical limitations except that his ability to do postural activities and push and pull with his leg was limited to occasionally. The ALJ also included limitations related to Kimball's mental impairments. Kimball faults the ALJ for limiting only

some of his physical functioning based on the pain he alleges in his knee, arguing first that the ALJ did not consider whether the limits preclude work at the medium functional level, and, second, that the ALJ interpreted raw medical data to assess limitations due to knee pain.

> A.   Work at Medium Functional Level

When a claimant is not able to do the full range of work at an assessed functional level, the ALJ cannot rely exclusively on the Medical-Vocational Guidelines (commonly referred to as "the Grid") to determine that the claimant is not disabled.  See, e.g., Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001); Nguyen, 172 F.3d at 36; Stephen B. v. Kijakazi, No. 21-305-WES, 2022 WL 1156188, at *5 (D.R.I. Apr. 19, 2022).  In that situation, the ALJ must seek the opinion of a vocational expert to determine what, if any, work the claimant can do.  Biestek, 139 S. Ct. at 1152-53; Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).

In this case, the ALJ relied on the testimony of the vocational expert to determine what work Kimball could do with his limitations and did not rely exclusively on the Grid.  Thus, the ALJ considered Kimball's ability to work at the medium functional level plus additional restrictions for his mental impairments and knee pain.

B.   <u>Evidence of Knee Pain</u>

Kimball argues that because there is no medical opinion that provides the limitations the ALJ found based on his knee pain, the ALJ must have interpreted raw medical data herself, which is not allowed.  He also contends that the ALJ erred in failing to explain why the knee pain did not further limit his activities, including standing and walking.

The ALJ wrote at Step 2 that Kimball's treatment records did not support the level of pain he was claiming, and for that reason, she did not find a severe medically determinable impairment caused by pain in his knee.  In other words, the lack of medical evidence precluded the limitations Kimball was claiming.  Despite the lack of medical evidence, the ALJ took Kimball's statements in the light most favorable to him and included restrictions in the residual functional capacity on his ability to push and pull and do postural activities to account for his knee pain.  The basis of those restrictions was Kimball's own statements, not the medical record, and an ALJ may give the claimant's statements the benefit of the doubt. Marceine D. v. Kijakazi, No. 20-cv-317-GZS, 2021 WL 5585730, *3 (D. Me. Nov. 20, 2021).  Contrary to Kimball's challenge, the ALJ explained why she did not find any greater limitations based on knee pain and did not interpret raw medical data in finding those restrictions.  Therefore, Kimball has shown no reversible error.

## CONCLUSION

For these reasons, Kimball's motion to reverse and remand (doc. no. 9) is denied. The Acing Commissioner's motion to affirm (doc. no. 11) is granted.

The decision of the Acting Commissioner is affirmed.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

July 12, 2022

cc: Counsel of record.

21